UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-14336-CV- MARTINEZ
MAGISTRATE JUDGE REID

KENNETH POLLAK,

    Petitioner,

v.

MARK INCH,

    Respondent.
_____/

## **REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE**

### I.    Introduction

This matter is before the Court upon an amended petition for writ of habeas corpus [ECF 10], filed pursuant to 28 U.S.C. § 2254, by the *pro se* petitioner, **Kenneth Pollak.** Petitioner is challenging the constitutionality of his State conviction and sentence for solicitation to commit first degree murder entered in the Circuit Court of the Nineteenth Judicial Circuit in and for Martin County, Case No. 2003CF000991CFA.

This cause has been referred to the undersigned for consideration and report pursuant to 28 U.S.C. § 636(b)(1)(B), S.D. Fla. Admin. Order 2019-2, and Rules 8 and 10 of the Rules Governing Section 2254 Cases in the United States District Courts. [ECF 2].

Petitioner has raised eleven claims. He has acknowledged that his petition is untimely but argues that he is entitled to equitable tolling due to the effects of medication that prevented him from timely filing the petition. For the reasons discussed in this Report, the instant petition is untimely and should be dismissed.

## II.     Relevant Procedural History

Petitioner was charged with solicitation to commit first degree murder of his ex-wife. [ECF 20-1, pp. 2-3]. After a jury trial he was convicted as charged. [*Id.*, p. 4]. After adjudicating Petitioner guilty, the state court sentenced him to thirty years imprisonment. [*Id.*, pp. 6-10]. On November 29, 2006, the state appellate court affirmed his conviction and sentence. *Pollak v. State*, 948 So. 2d 770 (Fla. 4th DCA 2006). Rehearing was denied on February 9, 2007. [ECF 20-1, p. 133].

On April 3, 2007, Petitioner filed a motion for modification of sentence. [ECF 26-1, pp. 4-15]. In the motion he explained that he had a "rare and incurable blood disorder known as Factor V Leyden."[*Id.*, p. 5-6]. The trial court denied the motion. [*Id.* , pp. 17-19].

On February 14, 2008, Petitioner filed a *pro se* motion to vacate his conviction pursuant to Fla. R. Crim. P. 3850 ("Rule 3.850 motion") raising nine claims. [*Id.*, pp. 135-171]. The trial court summarily denied five of the claims and granted an evidentiary hearing on the remaining four claims. [*Id.*, pp. 179-183]. After an evidentiary hearing the trial court denied the four remaining claims. [*Id.*, pp. 185-

188]. Petitioner appealed the denial. During the appeal, appointed counsel was permitted to withdraw after counsel notified the appellate court that he was "unable to raise an error that could be argued as a predicate for relief." [*Id.*, pp. 190-193]. The appellate court provided Petitioner an opportunity to file a brief. [*Id.*, p. 193]. On January 28, 2013, after Petitioner failed to file a brief, the appeal was dismissed. [*Id.*, p. 199].

On January 27, 2014, Petitioner filed a petition for writ of mandamus in the Florida Supreme Court seeking to have his appeal reinstated. [*Id.*, pp. 307-316]. On April 17, 2014, the Florida Supreme Court denied the petition. [*Id.*, p. 318].

On March 1, 2012, while his first Rule 3.850 motion was still on appeal, Petitioner filed a second Rule 3.850 motion based on newly discovered evidence. [Id., pp. 21-31]. On July 24, 2014, Petitioner filed an amended Rule 3.850 motion raising three claims. [*Id.*, pp. 320-337]. The trial court entered an order dismissing two of the claims and granting an evidentiary hearing on one claim. [*Id.*, pp. 353-54]. The trial court later vacated the order granting an evidentiary hearing and denied the remaining claim without a hearing. [*Id.*, pp. 382-385]. Petitioner appealed *pro se*. [*Id.*, pp. 388-429]. The appellate court affirmed the denial of the Rule 3.850 motion. [Id., p. 431]. Mandate issued on November 17, 2017. [*Id.*, p. 433].

On September 15, 2015, while the second Rule 3.850 was pending, Petitioner filed a third Rule 3.850 motion. [*Id.*, pp. 440-450]. He then filed an amended motion

3

on March 31, 2017. [*Id.*, pp. 452-470]. The motion was denied as untimely. [*Id.*, pp. 472-73]. Petitioner appealed *pro se*. [*Id.*, pp. 475-492]. The appellate court affirmed the denial of the motion as untimely and warned Petitioner that "further abusive or repetitive filing may result in sanctions." [*Id.*, p. 494-96]. Mandate issued on April 5, 2018. [Id., p. 498].

Subsequent to the filing of this petition, on May 9, 2018, the Petitioner filed a petition for belated appeal in the state appellate court. The state appellate court denied the petition on May 31, 2018.

The Petitioner initiated the instant proceedings on October 4, 2017 when he mailed his first petition. [ECF 1]. In his reply to the government's response he has correctly conceded that the petition is untimely but argues that he is entitled to equitable tolling or alternatively that the court should consider the merits because he is actually innocent. [ECF 36].

### III. Discussion - Timeliness

#### A. *Equitable Tolling*

Because the petition was not concededly not filed within one year of the date Petitioner's conviction became final, this federal habeas proceeding is due to be dismissed unless Petitioner can establish that equitable tolling of the statute of limitations is warranted. Petitioner first contends that a serious health condition has prohibited him from timely pursuing this federal habeas petition.

4

The one-year limitations period set forth in § 2244(d) "is subject to equitable tolling in appropriate cases." *Holland v. Florida*, 560 U.S. 631, 645 (2010). A "'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* at 649 (*quoting Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also, Brown v. Barrow*, 512 F.3d 1304, 1307 (11th Cir. 2008) (noting that the Eleventh Circuit "has held that an inmate bears a strong burden to show specific facts to support his claim of extraordinary circumstances that are both beyond his control and unavoidable with diligence, and this high hurdle will not be easily surmounted).

Petitioner directs the court to his motion for appointment of counsel for an explanation of his medical condition. In that motion [ECF 16] Petitioner recounts his medical condition and the various medications he is taking. He contends that his medical difficulties prevented him from filing a timely petition.

Petitioner's state court pleadings belie his allegations here. Despite Petitioner's claim that he has trouble putting together his thoughts, he has been able to prepare and file multiple post-conviction *pro se* pleadings in state court. These pleadings include a motion for modification of sentence, three motions for post-conviction relief, a petition for writ of mandamus and a petition for belated appeal. The court notes that Petitioner's medical condition existed at the time of his trial and

did not prevent him from pursuing *pro se* state post-conviction relief. Petitioner has not established that he is entitled to the rare and extraordinary remedy of equitable tolling. His request for equitable tolling should be denied.

### B. *Fundamental Miscarriage of Justice/Actual Innocence*

It is well settled that actual innocence may also serve to overcome the procedural bar caused by an untimely filing. The United States Supreme Court has determined that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup v. Delo*, 513 U.S. 298 (1995), and *House v. Bell*, 547 U.S. 518 (2006), or expiration of the AEDPA statute of limitations. *See McQuiggin v. Perkins*, 569 U.S. 383, 399-400 (2013).

"[T]he *Schlup* standard is demanding and permits review only in the " 'extraordinary' case." *House* at 538. *Schlup* observes that "a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.... To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup* at 324.

To succeed on a claim of actual innocence, the petitioner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.' " *House* at 536-37 (quoting *Schlup* at 327).

Courts have emphasized that actual innocence means factual innocence, not mere legal insufficiency. *See Bousley v. United States, 523 U.S. 614, 623-624 (1998)*; *see also High v. Head*, 209 F.3d 1257, 1270 (11th Cir. 2000); *Jones v. United States*, 153 F.3d 1305, 1308 (11th Cir. 1998) (holding that appellant "must establish that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him") (internal quotations and citation omitted).

Petitioner cannot establish his factual innocence. The state presented several witnesses who testified regarding Petitioner's intention to have Naomi, his ex-wife, killed. Petitioner's doctor testified regarding conversations with Petitioner that led the doctor to conclude that Petitioner wanted his ex-wife killed. [ECF 19-1, pp. 182, 192]. John Alsup, who was in jail with Petitioner, testified that Petitioner complained about his wife and said, "he wanted to see her dead." [ECF 19-2, pp. 55-57]. When it became clear that Petitioner wanted Alsup's help and paid Alsup $2,200.00, Alsup contacted his attorney who contacted law enforcement. [*Id.*, p. 59].

After Special Agent Tony Rodriguez spoke to Alsup's attorney he began an investigation into Alsup's allegations. [ECF 19-2, pp. 21-22]. After verifying the

information, Rodriguez contact the authorities in Georgia. [*Id*., p. 29]. He later contacted the intended victim and arranged for the creation of a staged photograph of her death. [Id., p. 36]. A fake photograph was created. [*Id.*, p. 37-38].

A number of Petitioner and Alsup's telephone conversations were recorded and played at trial. During recorded conversations, they discussed "phase one" which Alsup testified was the murder of Petitioner's ex-wife and children. [ECF 19-3, p. 14]. At one point in a recorded conversation, Petitioner told Alsup to get his "boy up north in a hurry" to commit the murder. [*Id*., p. 23]. He also acknowledged that he wanted confirmation of the killing on video or DVD. [*Id.*, p. 26]. When further payment was discussed, Petitioner told Alsup that he could not do anything until he received confirmation. [*Id.*, p. 36-37].

In a subsequent phone call, Petitioner and Alsup conduct a more detailed discussion of the plan. [*Id.*, pp. 43-54]. Alsup asked Petitioner whether this is what he really wanted. [*Id.*, p.44]. Petitioner confirmed there is no need to have a conversation and that they just needed to get phase one out of the way. [*Id.*]. They discussed payment and how to send Petitioner confirmation. [*Id.*, pp. 46-47]. The agreed payment was $10,000.00, to be paid after thirty days. [*Id.*, p. 50]. The confirmation would be mailed to Petitioner's house. [*Id.*, p. 47-48].

Petitioner explained that he wanted it to look like an accident. [*Id.*, p. 48]. Alsup asked if "once this is done, are we gonna [sic] want to take care of that other

8

bitch, that attorney?" [*Id.*, p. 51]. Petitioner responded, "I well, I mean, you know, I don't know." [*Id.*]. Alsup concluded with, "Say goodbye to Naomi, Ken. Say goodbye." [*Id.*]. Petitioner responded, "Looking forward to phase two buddy." [*Id.*].

Alsup later called to advise Petitioner that it had been done. [*Id.*, p. 97]. Petitioner later confirmed that his mother had put the payment in the envelope. [*Id.*, p. 102].

Special Agent Rodriguez testified that after the telephone calls between Alsup and Petitioner, he arranged to provide Petitioner with the confirmation. [*Id.*, p. 125]. He also testified that the money discussed in the telephone calls was found where Petitioner said it would be, on the rear set of steps to the side of Petitioner's mobile home. [*Id.*, p. 130]. In executing a search warrant of Petitioner's home the photograph of the staged murder was found underneath Petitioner's mattress. [*Id.*, p. 132].

Against this evidence Petitioner has alleged that he has new evidence that would establish that he is actually innocent. [ECF 10, p. 5]. He identifies a July 22, 2003 letter from Alsup that he contends shows that no solicitation for murder had yet occurred. [*Id.*]. He also relies on telephone calls Alsup made to his mother. [*Id.*]. He cites to the testimony of Darryl Miller at an evidentiary hearing where Miller claimed that Alsup offered to recant his testimony in exchange for $20,000.00. [*Id.*]. He also refers to Zachary Parker and Gerald Grant who were purported witnesses to

disclosures made by Calvin Newton to Petitioner regarding admissions made by Alsup to Newton that he lied at Petitioner's trial. [*Id.*, p. 6]. Petitioner acknowledges that Calvin Newton is deceased. [*Id.*, p. 7]. Finally, Petitioner refers to what he opines was Alsup's false testimony at Petitioner's trial regarding the circumstances of a prior conviction. [*Id.*].

Petitioner has not presented any new admissible evidence that would have affected the outcome of his trial. The July 22, 2003 letter is certainly not exculpatory. [ECF 11, p. 3-5]. In the letter, Alsup referred to Petitioner's ex-wife and wrote, "Now I see why you want her to be removed from the big picture! called life!" [*Id.*, p. 4]. He then wrote, "I just need to know your wishes regarding Naomi's untimely departure" and invited Petitioner to be open in his return letter. [*Id.*]. If anything, this letter was a continuation of the police investigation seeking to obtain an incriminating statement from Petitioner. Had the letter been introduced at trial it was more likely to be harmful rather than helpful to Petitioner's case.

Miller's testimony at the evidentiary hearing made no mention of a $20,000.00 payment for Alsup to recant his testimony. [*Id.*, pp. 6-11]. While Miller testified that Alsup had sought payment to recant his testimony, Miller never told Petitioner's mother anything about payments to Alsup to recant. [*Id.*, p. 11]. Even if this evidence were presented, the only thing it proves is that Alsup was willing to

recant his testimony for payment. It does not establish that Alsup had lied at Petitioner's trial.

The allegations the Petitioner seeks to present via Zachary Parker and Gerald Grant are also unavailing. Both of these individuals would purportedly testify that Calvin Newton told them that Alsup had told Newton that he had lied when he testified at Petitioner's trial. The testimony of Parker and Grant would be inadmissible hearsay, as would any testimony of Newton, were he still alive.

Petitioner's further relies on allegations of false testimony from Alsup regarding a prior conviction as well as pretrial phone calls from Alsup to Petitioner's mother prior to his trial.[1] He contends that the state's entire case relied upon Alsup's credibility and that Alsup's allegedly false testimony regarding a prior conviction for grand theft could have been used to impeach his credibility. However, the transcripts of Petitioner's conversations with Alsup established that Petitioner had solicited Alsup to murder his ex-wife and that Petitioner was aware of and participated in the planning of the murder. Petitioner asked for confirmation in the form of a photograph, suggested that it look like an accident, and reviewed the photograph that was provided. After receiving the photograph, Petitioner left

---

[1] A review of the transcripts of the telephone calls does not reveal that Alsup offered any details about exonerating information. [ECF 11, pp. 12-39]. In the phone calls Alsup denies to Petitioner's mother that he was involved, however as the evidence as trial established Alsup was involved in Petitioner's plan to kill his ex-wife. In the last telephone call, Alsup told Petitioner's mother that he is not going to do something that might hurt Petitioner, however Alsup never expounds on this and ultimately did testify at the trial.

11

$1,000.00 in payment of expenses and had agreed to pay $10,000.00 within thirty days. In light of this evidence, Petitioner cannot establish that impeaching Alsup regarding a prior conviction would have changed the outcome at trial.

As discussed above a credible claim of actual innocence required that Petitioner support his allegations with "new reliable evidence-whether it be **exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence**-that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner must then establish that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327).

The Petitioner has not presented exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence to support his claim of actual innocence. The Petitioner has failed to make a substantial showing that he is actually innocent of the crime of soliciting the murder of his ex-wife. In light of all the evidence it is not more likely than not that no reasonable juror would have convicted Petitioner had the evidence Petitioner identifies been admitted. In the absence of a showing of actual innocence, no fundamental miscarriage of justice will result by barring the claims raised in this habeas proceeding for lack of timeliness.

## IV. Evidentiary Hearing

Since the habeas petition can be resolved by reference to the state court record there is no need for an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)(holding that if the record refutes the factual allegations in the petition or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing). Petitioner has failed to satisfy the statutory requirements in that he has not demonstrated the existence of any factual disputes that warrant a federal evidentiary hearing.

## V. Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA") to do so. 28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180 (2009).

This Court should issue a COA only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Alternatively, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it

debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

After review of the record, Petitioner is not entitled to a certificate of appealability. If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

## VI. Recommendations

Based upon the foregoing, it is recommended that this petition for habeas corpus relief be DISMISSED as TIME-BARRED, that his motion to amend be denied as moot, and that no certificate of appealability issue, and that the case be closed.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn,* 474 U.S. 140, 149 (1985).

SIGNED this 29th day of January, 2020.

_____
UNITED STATES MAGISTRATE JUDGE

cc: Kenneth M. Pollak
K67018
Avon Park Correctional Institution
Inmate Mail/Parcels
8100 Highway 64 East
Avon Park, FL 33825
PRO SE

Don M. Rogers
Attorney General Office
1515 N Flagler Drive
9th Floor
West Palm Beach, FL 33401-3432